IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-444-FL

| | |
|---|---|
| DEBRA TAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court upon the parties' cross Motions for Judgment on the Pleadings. (DE's 33 & 35). The time for the parties to file any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of a Memorandum and Recommendation. For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-33) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-35) be GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on September 17, 2007, alleging that she became unable to work on December 25, 2006. (Tr. 13). This application was denied initially and upon reconsideration. *Id.* A hearing was held before an Administrative Law Judge ("ALJ"), who determined that Plaintiff was not

1

disabled during the relevant time period in a decision dated November 23, 2009. *Id.* at 13-20. The Social Security Administration's Office of Hearings and Appeals ("Appeals Council") denied Plaintiff's request for review on August 21, 2010, rendering the ALJ's determination as Defendant's final decision. *Id.* at 1-5. Plaintiff filed the instant action on October 19, 2010. (DE-1).

**<u>Standard of Review</u>**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
>
> *Id.*

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, . . . [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute . . . [its] judgment for that of the Secretary." <u>Craig</u>, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by

2

substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

**<u>Analysis</u>**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
>
> <u>Mastro v. Apfel</u>, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 25, 2006. (Tr. 15). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) knee arthritis; 2) hip bursitis; 3) history of headache; 4) hypothyroidism; and 5) history of ulnar neuropathy. *Id.* at 16. However, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* Based on the medical record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform the full range of sedentary work. *Id.* at 16-19.

3

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was able to perform her past relevant work as a dispatcher. *Id.* at 19. Based on these findings, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision. *Id.* at 19-20. These determinations were supported by substantial evidence, a summary of which now follows.

Plaintiff received treatment at Carolina Regional Orthopaedics from January 24, 2001 until March 30, 2008. *Id.* at 313-362. On August 29, 2005, it was noted that Plaintiff fell at work—hitting her left knee and twisting her right knee. *Id.* at 325. Although her knees were sore, she was doing "reasonably well." *Id.* She had good range of motion and no swelling in either knee. *Id.* In addition, Plaintiff had good strength at both lower extremities. *Id.* X-rays of the lumbar spine showed postoperative fusion with hardware in place. *Id.* There was no evidence of loosening, fracture, dislocation, lesion or masses. *Id.* Likewise, X-rays of the left knee showed postoperative changes associated with a left knee replacement. *Id.* Neither knee demonstrated fracture, dislocation, lesions or masses. *Id.* Ultimately, Plaintiff was diagnosed with: 1) low back strain, resolved; 2) left knee strain, status post knee replacement with patellar tendon insertional pain; and 3) right knee degenerative joint disease exacerbated by fall or possible meniscal tear. *Id.* Plaintiff was allowed to progress to weight bearing as tolerated and given Darvocet for pain relief. *Id.* In addition, Plaintiff received a Cortisone injection in the right knee which she tolerated well. *Id.* On October 12, 2005, Plaintiff had a good range of motion in both knees. *Id.* at 324. She had no significant swelling, erythema, or effusion in either knee. *Id.* X-rays of the left knee showed that her prosthesis was well seated. *Id.* There was no evidence of fracture, dislocation, lesions, masses or loosening. *Id.* at 324. Plaintiff was diagnosed with "bilateral knee contusion injury with right knee underlying [degenerative joint

4

disease] and left knee replacement with some persistent patellar tendon tenderness." *Id.* She was recommended for physical therapy, but otherwise instructed to resume normal activities as tolerated. *Id.* Upon examination on November 15, 2005, Plaintiff had "reasonably good range of motion" in both knees and was described as "doing reasonably well." *Id.* at 323. She was instructed to continue her current activities. *Id.* Again on December 5, 2005, Plaintiff had "reasonably good range of motion without significant swelling or erythema over the left knee patellar tendon where she does have some slight persistent swelling." *Id.* at 322. It was noted that Plaintiff had a right knee contusion with underlying arthritis. *Id.* On December 28, 2005, Plaintiff stated that she continued to have pain, and that she believed that it "may be aggravated by the way she walks." *Id.* at 321. Despite her pain, Plaintiff still had a reasonably good range of motion. *Id.* She was given a steroid injection in her left hip. *Id.* Plaintiff was instructed to rest for two weeks, and then to return to sitting work. *Id.* During a February 9, 2006 examination, Plaintiff stated that the steroid injection helped her symptoms. *Id.* at 320. She had good range of motion and strength in both knees. *Id.* Plaintiff was diagnosed with degenerative joint disease in both knees and bursitis in her left hip. *Id.* Another steroid injection was administered in Plaintiff's left hip and right knee, which she tolerated well. *Id.* It was noted that Plaintiff could "progress activities at work." *Id.* Dr. Robert C. Martin examined Plaintiff on March 14, 2006. *Id.* at 319. He diagnosed Plaintiff with: 1) chronic left hip trochanteric bursitis; 2) right knee osteoarthritis aggravated by a work related injury; and 3) left total knee replacement with tedonopathy. *Id.* Both knee conditions were described as "stable" although Dr. Martin indicated that Plaintiff's left knee was still symptomatic. *Id.* Ultimately, Dr. Martin opined that Plaintiff had reached maximum medical improvement. *Id.* Although Plaintiff had partial permanent impairments in both knees and her left hip, she was still capable of normal work.

5

*Id.* On August 29, 2006 it was reiterated that Plaintiff could continue regular work activities. *Id.* at 318. Plaintiff complained of significant numbness in her left hand on February 27, 2008. *Id.* at 317. It was noted that Plaintiff had previously undergone left carpal tunnel surgical release which had helped her significantly. *Id.* Dr. Alberto J. d'Empaire advised Plaintiff to obtain EMG/nerve conduction studies. *Id.* Plaintiff was examined by Dr. Divya J. Patel on March 7, 2008. *Id.* at 316. She demonstrated mild atrophy of the left hand compared to the right side. *Id.* There was no obvious erythema of the left hand, however. *Id.* Weakness in her left grip was also observed. *Id.* EMG/nerve conduction studies revealed electrical evidence for left ulnar neuropathy above the elbow and left median neuropathy above the wrist. *Id.* Dr. Patel diagnosed Plaintiff with: 1) left hand paresthesias; 2) left hand weakness with some pain; and 3) left ulnar neuropathy above the elbow. *Id.* On March 20, 2008, Plaintiff received an injection of Xylocaine and Dep-Medrol to treat these conditions. *Id.* at 314.

Eastern Neurological & Spine Associates provided treatment for Plaintiff from August 11, 2003 through August 9, 2007. *Id.* at 223-255. On January 31, 2005, it was noted that Plaintiff was doing well and had no complaints. *Id.* at 224. Dr. F. Douglas Jones observed no change in Plaintiff's right internal carotid artery aneurysm on May 31, 2006. *Id.* at 223. Plaintiff underwent a head CT on August 9, 2007 which revealed no further changes. *Id.* at 241. Specifically, the CT indicated: 1) a stable small right internal carotid artery aneurysm; and 2) a stable aneurysm clip at the left supraclinoid carotid artery near the ophthalmic artery origin. *Id.*

On December 25, 2006, Plaintiff was admitted to Wilson Medical Center after slipping and sustaining a comminuted supracondylar fracture of her left knee. *Id.* at 207. She had previously undergone a total knee replacement. *Id.* Plaintiff underwent a intramedullary nailing of the comminuted fracture. *Id.*

6

Dr. Robert Appert treated Plaintiff with regard to her left leg fracture. *Id.* at 275-287. He observed on January 4, 2007 that Plaintiff was doing "reasonably well." *Id.* at 284. The fixation of the interlocking nail used to repair Plaintiff's fracture was tenuous, however. *Id.* Plaintiff was "[f]eeling well but still having moderate spasms" on January 10, 2007. *Id.* at 283. After a January 24, 2007 examination, Plaintiff was described as "doing well." *Id.* at 282. X-rays were stable and Plaintiff no longer required a knee immobilizer. *Id.* Likewise, on February 8, 2007, Plaintiff was described as "[d]oing reasonably well." *Id.* at 280. Her wound was clean and dry and X-rays were stable. *Id.* at 280. On February 27, 2007 Dr. Appert indicated that a good callus was forming on Plaintiff's leg fracture. *Id.* at 287. Plaintiff was still having a moderate amount of discomfort, however. *Id.* at 279. On March 29, 2007, Plaintiff was admitted to the hospital for the removal of the retained screw in her left femur. *Id.* at 278. Dr. Appert stated on April 10, 2007 that Plaintiff was doing "reasonably well" after this procedure. *Id.* at 277. He further stated that Plaintiff could continue full weight bearing. *Id.* On May 10, 2007, no fractures were identified and the rod was in good position. *Id.* at 286. Plaintiff was again doing "reasonably well", and had a full range of motion of the knee. *Id.* at 276. Dr. Appert indicated that he was going to discontinue Plaintiff's narcotic usage. *Id.* at 276. Finally, on May 30, 2007, Dr. Appert stated that Plaintiff was capable of returning to work. *Id.* at 275. X-rays revealed that Plaintiff's fracture was in satisfactory position and alignment with excellent callus. *Id.* The bone was solid. *Id.* Although, Plaintiff wanted narcotics, Dr. Appert stated that he was "not going to oblige her with anything more than a prescription for Darvocet at this point." *Id.*

Heritage Hospital provided treatment for Plaintiff from April 24, 2007 until February 7, 2009. *Id.* at 363-447. On May 28, 2007, Plaintiff reported to the emergency room with a

headache. *Id.* at 419. The headache was accompanied by light and sound sensitivity. *Id.* However, Plaintiff refused a CT scan. *Id.* at 420. Instead, Plaintiff requested pain medication. *Id.* She was reassessed after taking her pain medication and her headache was almost gone. *Id.* Plaintiff was diagnosed with myringitis and headache and then discharged. *Id.* Again on June 27, 2007 Plaintiff complained of a headache. *Id.* at 413. She indicated that she has a history of headaches, usually on the left side of her head. *Id.* The headache was accompanied by nausea and vomiting, although Plaintiff largely denied any other significant signs or symptoms. *Id.* A CAT scan showed no evidence of acute intracranial process. *Id.* Ultimately, Plaintiff was discharged in stable condition and instructed to return if her symptoms worsened. *Id.* On September 3, 2007, Plaintiff went to the emergency room with complaints of a headache. *Id.* at 399-402. Plaintiff reported that she was not nauseous or vomiting, but was upset because she could not afford her medications. *Id.* at 399. She was consoled by the physician and received narcotic medications to take with her. *Id.* at 400. On June 20, 2008, Plaintiff returned with complaints of a headache. *Id.* at 380-385. She indicated that she experienced this type of headache a couple times a year. *Id.* at 382. In addition, she vomited once and continued to feel nauseated. *Id.* Upon examination, Plaintiff described her pain as "moderate" and stated that it did not radiate. *Id.* In addition, she reported no visual changes, focal weakness or sensory changes. *Id.* at 382. Plaintiff was discharged home "in good condition" with a prescription of Lortab, as requested by Plaintiff. *Id.* at 384. On February 7, 2009, Plaintiff again complained of a headache. *Id.* at 365-372. Plaintiff explained that this headache was similar to the type she experienced frequently. *Id.* No fever, nausea, vomiting, neck or back pain, or focal weakness accompanied this headache. *Id.* at 368. She denied any other problems or concerns. *Id.* A head CT showed evidence of the prior aneurysm clipping, but no evidence of an acute hemorrhage,

mass-effect, hydrocephalus or shift. *Id.* at 367. Likewise, examination revealed that Plaintiff had full strength and no local neurological findings. *Id.* at 370. Plaintiff was treated with Benadryl, Reglan, and Toradol, and was discharged with a prescription for Lortab. *Id.* at 370. Plaintiff again went to the emergency room with complaints of a headache, nausea and dizziness on May 19, 2009. *Id.* at 443. She was released and discharged the same day. *Id.* at 446. At the time of her discharge, her headache was "almost relieved". *Id.*

Plaintiff was treated at Chapel Hill Orthopedic Surgery and Sports Medicine from August 2, 2007 until August 20, 2007. *Id.* at 189-193. Upon examination on August 2, 2007, Plaintiff had a well healed surgical scar over her left knee. *Id.* at 189. The right knee showed some tenderness both medially and laterally. *Id.* Her knee components were intact and showed no evidence of loosening. *Id.* In addition, Plaintiff's left femoral fracture had healed. Plaintiff was diagnosed with osteoarthritis in her right knee with possible internal derangement. *Id.* On August 20, 2007, it was noted that a right knee injection did not seem to help Plaintiff. *Id.* at 190. Her knee continued to give way, lock and catch. *Id.* During examination, Plaintiff had tenderness and crepitus was felt within the knee. *Id.*

On November 7, 2007, Plaintiff's RFC was assessed. *Id.* at 214-221. It was determined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; and 4) sit (with normal breaks) for a total of about six hours in an eight hour workday. *Id.* at 215. Plaintiff's ability to push and/or pull was limited in her lower extremities. *Id.* She was deemed incapable of climbing ladders, ropes or scaffolds. *Id.* at 216. However, it was opined that Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl. *Id.* No manipulative, visual, communicative, or environmental limitations were noted.

9

*Id.* at 217-218. This RFC determination was affirmed by Dr. Melvin Clayton on December 21, 2007. *Id.* at 222.

Finally, the record also includes a Physical RFC Assessment form, dated February 10, 2010 (over two months after the ALJ's decision). *Id.* at 471-73. On the form, someone - it is unclear who has signed this document - opined that Plaintiff can lift and/or carry less than 10 pounds frequently or occasionally, requires a sit/stand option, and is limited in her ability to push and/or pull with her lower extremities because one of her knees is "virtually frozen". *Id.* at 471-72. No explanation of the evidence supporting these conclusions is given. *Id.* at 472 Likewise, there is no description of what medical records were reviewed, and there is no indication that the individual is dating this assessment back to the period in question. *Id.*

During the hearing in this matter, Plaintiff testified that she was incapable of working because her legs would swell severely if they were not elevated. *Id.* at 27. She also stated that she suffered from chronic pain in her left leg and knee. *Id.* at 27-28. In addition, Plaintiff testified that she had bursitis in her left hip. *Id.* at 28. According to Plaintiff, she is very unstable when she walks and is constantly fearful that she is going to fall. *Id.* at 28. Furthermore, Plaintiff stated that she suffers from back pain. *Id.* at 29. With regard to her left hand, Plaintiff testified that she "lost control and feeling of . . . [her] pinky finger . . . ring finger and half of . . . [her] hand" *Id.* Because of this she has difficulty using her hands. *Id.* For example, Plaintiff asserted that she had difficulty tying her shoes. *Id.* Plaintiff also testified with regard to her headaches. She contended that she frequently suffers severe migraine headaches. *Id.* at 29-30. Among other things, Plaintiff indicates she uses a TENS unit to relieve her pain. *Id.* 30-31. Because of these conditions, Plaintiff testified that she could sit for 30 minutes before needing to move or change positions. *Id.* at 31. She asserted that she could stand for about 10 or 15 minutes

10

at a time and only walk about two blocks before needing to rest. *Id.* at 32. According to Plaintiff, she could lift no more than a gallon of milk and could not bend over at the waist or knees. *Id.* at 33.

Diane Harold, Plaintiff's sister, also testified at Plaintiff's hearing. Ms. Harold testified that since Plaintiff broke her leg, "she had not been the same on her legs" and that Plaintiff's gait was unsteady. *Id.* at 37. She also testified that Plaintiff's legs swell if Plaintiff stands for too long. *Id.* Finally, Ms. Harold contended that Plaintiff had headaches every day and "major headaches" once or twice a week. *Id.* at 38.

A vocational expert also testified that Plaintiff's past relevant work was classified as sedentary work. *Id.* at 42.

Based on this record, the ALJ made the following specific findings:

> The evidence in the file does not document any findings, signs or limitations of the severity required by section 1.02, 11.04, and 9.04. The undersigned finds that these impairments, singly or in combination, based upon a review of the medical evidence, do not meet listing level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment . . .
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of sedentary work . . .
>
> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met . . .
>
> The evidence of record discloses that the claimant has a history of treatment for a variety of impairments. She has longstanding history of headache pain. The claimant has remote history of left internal carotid artery aneurysm with successful clipping. Her regular follow-up head CT scans have shown no changes or recurrence since her surgery. However, the medical evidence

shows she has been treated in the emergency department (ED) for her headache complaints. There is mention in the record that the claimant had photophobia during at least one headache exacerbation. She takes no prophylactic medications, but has received narcotic medications in the ED and been prescribed medication for pain by her primary care physician. Records show the claimant has no complaints of frequent nausea, vomiting or sensitivity to noise. In fact, she has arrived at the ED alone and driven herself home following treatment for her headache. The claimant said the frequency of her headache is usually two or three times a month. She testified that she straps a bag of ice on her head which seems to help relieve her symptoms (Exhibits 10F, and l2F).

The claimant has history of lumbar fusion L4-L5 in 2000 with solid healing. The claimant had left total knee replacement in 2002. She has had the occasional mild flare of left hip bursitis which she said caused her sleep disturbance. The medical evidence shows the claimant had a fall accident in August 2005 which caused her low back strain and left knee strain, but her symptoms resolved with medication and cortisone injection. Her lumbar spine x-ray showed the hardware intact with solid fusion. Her left knee x-ray showed the hardware intact with no evidence of fracture. Her right knee x-ray showed mild to moderate degenerative joint disease. The claimant had progressive improvement in her left knee complaints with use of her TENS unit and physical therapy. She reached maximum medical improvement by March 14, 2006 and was released from care with permanent partial impairment ratings for her left knee of three percent; right knee two percent, and left hip one percent. Subsequent records of August 2006 show the claimant complained of waxing and waning left knee symptoms including soreness and stiffness, but her examination showed her left knee range of motion to 120 degrees without effusion. She had some mild tenderness over the patellar tendon area and was diagnosed with chronic patellar tendonopathy. Nevertheless, Robert Martin, M.D., the claimant's treating orthopedic surgeon released the claimant from care to continue her regular work and activities (Exhibit 9F).

Additionally, the medical record disclosed that the claimant had a fall accident in 2005 with onset of right knee pain and x-ray findings of mild to moderate osteoarthritis. Further, she had history of left femur fracture on December 25, 2006 with distal femoral rod and nail insertion. She started gentle range of motion with no weight bearing in January 2007. She made good progress, but the retained screw was tenuous. She had removal of the retained distal screw in March 2007. Her wound was fully healed and she began full weight-bearing in April 2007. Robert Appert, M.D., the claimant's orthopedic surgeon, reported on May 10, 2007 that the claimant still had a tremendous requirement for narcotic medication. Yet her examination showed full range of motion in the left lower extremity. Her

12

left hip and leg x-ray showed the hardware in good position. Dr. Appert discontinued the narcotic medication and started the claimant on Talacen for pain. On further follow-up May 30, 2007, the claimant requested narcotic medication. Dr. Appert was emphatic that the claimant would no longer be prescribed narcotic medication as she was almost six months post-operative comminuted fracture left femur. Further, he noted the claimant had full range of motion in her left lower extremity with x-ray evidence of good position and alignment of the hardware, excellent callus with solid bone. Dr. Appert said the claimant was able to return to work by June 25, 2007 (Exhibit 6F).

Andrew Jones, M.D., an orthopedic specialist, examined the claimant in August 2007 for complaints of bilateral knee pain. Repeat x-ray of the left knee showed no evidence of loosening. Her x-ray of the left hip showed healed femur fracture with rod and nail in place. The x-ray of the claimant's right knee showed 50 percent decreased medial and lateral and patella femoral joint space with mild spurring. The claimant had steroidal injections with some relief of her discomfort. However, on follow-up, the claimant complained of right knee locking, give way and catching which caused her to have falling accident with right ankle sprain. Dr. Jones recommended arthroscopy, but the claimant did not follow-through with the surgery (Exhibit 1F).

The claimant is also diagnosed with hypothyroidism which appears fairly well controlled with medication (Exhibit 8F). She has history of left ulnar neuropathy. Her EMG and nerve conduction study of March 2008 showed left ulnar neuropathy at the elbow involving the sensory and motor fibers with slight irritation to the median nerve. The claimant had good response to cortisone injection and she was instructed to continue her wrist splint and her prescribed Lyrica (Exhibit 9F) . . .

In terms of the claimant's alleged hypothyroidism, she has had no problems since starting her medication therapy. Her headache exacerbations two or three times a month do not impose nausea, vomiting, blurred vision, or sensitivity to noise. She does not require prophylactic medication. She has been capable of driving herself to the ED for treatment during her exacerbations. Although the claimant has history of ulnar neuropathy, she had good relief with cortisone injections, use of her wrist splint and Lyrica. While the claimant complained of right knee give-way, her x-ray showed only mild osteoarthritis. She has diagnosis of left hip bursitis as a result of her left femur fracture, and subsequent surgery with hardware installation. Although she has residual left lower extremity pain complaints, her examinations have shown full range of motion and x-ray findings of good alignment, excellent callus formation and solid bone. Her treating orthopedic surgeon released the claimant to return to work in June 2007; six

months following her femur fracture and surgical remedy. The assigned residual functional capacity takes into account the effects of mild to moderate pain.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 16-19).

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's argument relies primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, her claims are without merit.

14

**Conclusion**

For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-33) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-35) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Wednesday, May 18, 2011.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE